UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

**KYLE ANTHONY LEWIS**,

                                   Plaintiff,

– v. –

**UNITED STATES OF AMERICA**,

                                   Defendant.

No. 15-cv-8354-CAS(ASx)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

        This matter was tried to the Court on October 21, October 27, October 28 and November 3, 2016.  William Karns appeared for plaintiff and Assistant United States Attorney Garrett Coyle appeared for the United States.

## I.    FINDINGS OF FACT

### A.    The accident

        1.    On the morning of January 9, 2015, United States Postal Service letter carrier Sue Silva was delivering mail on her normal route in Northridge.  She was driving a government-owned 1992 Grumman LLV Postal Service vehicle eastbound on Chase Street, just west of Tampa Avenue.

2.     Ms. Silva came to a red light at Tampa Avenue, and signaled to make a left turn to proceed north on Tampa Avenue.  After determining that it would take significant time to make a left hand turn, Ms. Silva decided instead to make a right hand turn onto Tampa Avenue going south where she planned to move to the center lane and turn left across Tampa Avenue into a parking lot, so that she could turn her vehicle around and make a right hand turn to proceed in the northerly direction on Tampa Avenue.

3.     Ms. Silva testified that once she made a right hand turn onto Tampa Avenue, she checked her mirrors, saw no cars behind her in the left lane, used her left turn signal, and then started to move into the left lane in accordance with her plan to turn around in the parking lot set as forth above.

4.     As Ms. Silva began to drive her vehicle into the left lane going south on Tampa Avenue, she collided into the passenger side of a 2012 Nissan Sentra driven by plaintiff Kyle Anthony Lewis.

5.     At the time of the collision Ms. Silva and plaintiff were traveling southbound in the same direction.

6.     After the collision, plaintiff stopped his car in the center lane without hitting any other cars or objects.

7.     Plaintiff was wearing his seatbelt when the collision occurred.

8.     No airbags deployed.

9.     Plaintiff was driving 53 miles per hour when the collision occurred. He had been accelerating just before the collision.

10.     The posted speed limit on Tampa Avenue where the collision occurred is 40 miles per hour.

11.     Both plaintiff and Ms. Silva were negligent.  Plaintiff was speeding based on data obtained from the Nissan's "black box."  According to the government's witness, had plaintiff been observing the speed limit, he could have braked to avoid the accident. However, Ms. Silva should have observed plaintiff in her side view mirror and was obligated not to change lanes until she was certain that the road was clear.  Plaintiff's

1

automobile should have been observable as it was plainly behind Ms. Silva's vehicle when she attempted to change lanes, and even if Ms. Silva could not see plaintiff from her left side view mirror, she should have looked to the left rear for oncoming traffic before she attempted to make a lane change. In light of these facts, it appears that plaintiff was fifty percent at fault and Ms. Silva was fifty percent at fault.

**B.    Plaintiff's injuries**

### *1.    Chest contusion and moderate back and neck strain*

12.    The parties dispute what injuries plaintiff suffered as a result of the January 9, 2015 accident ("the January accident"). According to the government, the only injuries plaintiff sustained from the January accident were a chest contusion and a moderate temporary back and neck strain. In this regard, the government asserts that plaintiff's only complaint to the paramedics and to the emergency room doctors on January 9, 2015, was moderate right rib pain.

13.    The government notes that the emergency room doctor ordered x-rays of plaintiff's neck and chest, both of which were negative.

14.    According to the government, the emergency room doctor also examined plaintiff's back and musculoskeletal system, both of which were normal, and noted no weakness.

15.    Finally, the government notes that the emergency room doctor diagnosed plaintiff with a chest contusion, prescribed a few days of pain medication, and discharged him the same day of the accident.

16.    Four days later, on January 13, 2015, plaintiff saw an orthopedist, Dr. Ramin Rabbani. At that time, plaintiff complained of chest, back, and neck pain. Dr. Rabbani diagnosed him with a chest contusion and a back and neck sprain. However, Dr. Rabbani opined that because this was a side impact collision, the injury was probably more severe, noting that plaintiff reported right flank pain which "can encompass the spine." Although Dr. Rabbani acknowledges that plaintiff's subsequent testimony that he experienced back pain with radiation at the time of the accident was not identified in

the emergency room records, he testified that delayed complaints of low back pain are common with a traumatic event such as the January accident.

17.    Plaintiff returned to see Dr. Rabbani on March 3, 2015, reporting continued cervical and lumbar pain that radiated to his buttocks and thighs.  Dr. Rabbani ordered more physical therapy and an MRI of the cervical and lumber spine.  According to Dr. Rabbani, the MRI showed disc protrusion at C5-6, disc bulges at L3-4 and L4-5.  The L4-5 disc bulge extended into the bilateral neural foraminal exit zones and resulted in a neural foraminal narrowing which, according to Dr. Rabbani, was the "primary culprit" of plaintiff's low back and radicular complaints.  Dr. Rabbani opined that it was unclear whether the January accident or long-standing degenerative disease caused the disc bulge, but given plaintiff's youth and the degree of plaintiff's pain, he believed the accident was the cause of this injury.

18.    Dr. Rabbani thereafter performed epidural injections in April and June 2015, to alleviate plaintiff's pain.  The injections provided temporary relief, but plaintiff's pain returned.  In October 2015, Dr. Rabbani performed a surgery in an attempt to decompress the nerves at L4-5.

### 2.    No head injury

19.    Although plaintiff asserts that the impact of the accident caused him to hit his head, plaintiff did not sustain a head injury in the accident.

20.    The accident caused plaintiff's head and body to move forward and to the right during the collision — that is, away from the driver-side door and towards the passenger seat.

21.    Consistent with these mechanics, plaintiff did not report head trauma or any symptoms of head injury to the paramedics responding to the scene of the accident, although he subsequently reported headaches when he visited Dr. Rabbani.  No signs of head trauma were noted by the paramedics or the emergency room medical staff.

22.    The paramedics assessed plaintiff's Glasgow Coma score as 15, which is normal.

23. Plaintiff denied having any headaches in the emergency room and reported no head injury.

24. The neurologist who saw plaintiff on January 21, 2015, reported no objective evidence of head injury, and neither the government expert nor plaintiff's expert asserts that plaintiff suffered a significant head injury.

25. A brain MRI on January 22, 2015, was normal.

26. An EEG on March 19, 2015, was normal.

### 3. *No herniated disc or pinched nerve*

27. Plaintiff did not sustain a herniated disc or pinched nerve in the accident.

28. The government asserts that the highest change in speed that plaintiff's body experienced during the collision was 3.1 miles per hour, and that a change of this magnitude was too mild to have caused a traumatic disc herniation in plaintiff's back or neck.

29. MRIs of plaintiff's neck and back on March 10, 2015, show longstanding degenerative changes, and not any abnormalities caused by acute trauma, such as a herniated disc or pinched nerve.

30. No other test results in the six months after the accident showed a herniated disc or pinched nerve.

### 4. *Recovery*

31. According to the government's experts, moderate soft-tissue strains like the one plaintiff sustained typically resolve within about six weeks as the soft-tissue inflammation gradually subsides.

32. Plaintiff reported that his chest pain had resolved by his second visit to Dr. Rabbani on March 3, 2015.

33. Dr. Rabbani performed a physical examination during plaintiff's March 3, 2015 visit. Aside from the MRI results described above, no objective test results showed any back or neck injuries.

/ / /

34. Plaintiff missed no days of work after the accident and continued to work full-time in his job as a machinist.

35. Dr. Rabbani did not place any physical restrictions on plaintiff's job duties, which involved regularly lifting up to 100 pounds.

36. Plaintiff received a positive performance review and was given a raise in April 2015.

37. Although the government provided expert testimony and argument that the reasonable amount was $11,786.90, plaintiff's health care providers billed a total of $16,211.50 for the care attributable to the January accident. This excludes emergency room services and does not take into account any amounts covered by plaintiff's insurance.

## C. Subsequent Events

38. In July and December 2015, plaintiff suffered two subsequent accidents. The first was a July 2015 work injury described below. The second was a December 2015 automobile accident described below. Plaintiff contends that the injuries and treatment following these subsequent accidents were exclusively caused by the January accident.

39. Plaintiff had an accident at work on July 11, 2015 ("the July 2015 work accident"), when he was tilting a water cart and developed pain in his lower back.

40. Plaintiff filed a worker's compensation claim for the accident which he apparently did not pursue and also submitted a claim for disability insurance benefits which was granted. In his application for disability benefits, plaintiff stated that his disability began on July 11, 2015. Ex. 524-0007. However, in the physician's portion of the application, Dr. Rabbani stated that plaintiff's disability began on January 13, 2015, following the January accident. Ex. 524-0011.

41. Three days after the July 2015 work accident, Dr. Rabbani noted that plaintiff would need to miss three months of work. Plaintiff notes, however, that he requested family medical leave on June 28, 2015, prior to the July 2015 work accident.

5

42. Pursuant to his application for disability insurance benefits, plaintiff was classified as temporarily totally disabled after the July 2015 work accident and did not return to work for about six months.

43. Although Dr. Rabbani opines that plaintiff's injury resulted from the January accident, plaintiff's symptoms after July 2015 work accident, appear to be principally attributable to his July 2015 work accident for the reasons set forth below.

44. Plaintiff was involved in another automobile accident on December 17, 2015. On this occasion, plaintiff's car was rear-ended while stopped at a red light. The accident caused his car to collide with the car in front of him. He was taken by ambulance to the emergency room.

45. Once again, the experts for plaintiff and the government dispute whether plaintiff's medical condition after this accident is attributable to the January accident from which this case arises.

**D. Plaintiff's medical care**

46. The only medical care that plaintiff received for his injuries from the January accident was pain medication and 20–24 physical therapy sessions.

47. After the initial 20–24 sessions, plaintiff received approximately 27 additional physical therapy sessions between the July 2015 work accident and the December accident.

48. Following the December accident plaintiff received approximately 33 additional sessions of physical therapy.

*1. Epidural injections*

49. Dr. Rabbani performed the epidural injections on plaintiff in April and June 2015, mentioned above.

50. The government argues that these epidural injections were unnecessary because such injections are indicated for a pinched nerve and plaintiff did not sustain a pinched nerve in the January accident.

/ / /

51. In any event, the government asserts that the reasonable value of the two epidural injections that Dr. Rabbani performed in April and June 2015 is $12,089.67.

52. The government further asserts that the reasonable value of the epidural injection that Dr. Sabbaghi, plaintiff's pain management physician, performed in July 2016, is $1,668.66.

### 2. *Back surgery*

53. In October 2015, Dr. Rabbani performed back surgery on plaintiff.

54. According to the government's experts, the indications for back surgery are clear symptoms of a pinched nerve supported by objective imaging studies and electrical tests, and plaintiff's imaging studies showed no evidence of a pinched nerve. They also opine that the electrical test from late July 2015 is not reliable evidence of a pinched nerve because the tester did not capture screen shots of the allegedly abnormal results. In any event, they note that this electrical test was not done until after plaintiff's July 2015 work accident. The government's experts conclude that to the extent plaintiff failed to show that any abnormalities in the test results were attributable to the January accident instead of the July 2015 work accident, it cannot be said that any such abnormalities stem from the January accident.

55. Therefore, the government's experts argue that the type of surgery that Dr. Rabbani performed was for a preexisting and longstanding condition, not any acute traumatic injury from the January accident. In this regard, they note that Dr. Rabbani did not perform a disc excision, a procedure to treat an acute injury such as a herniated disc. Instead, he performed a bone decompression, a procedure to treat facet arthrosis, a degenerative condition in which bone spurs grow on the back joints.

56. In any case, despite the surgery, plaintiff continued to complain of back pain after the surgery.

### E. Witness testimony

57. The testimony and report of the United States' accident reconstruction expert, Louis R. Peck, M.S.M.E., as to the speed of plaintiff's car at and before the

accident and the change in speed that his car experienced during the accident, were credible and convincing. Plaintiff's testimony about his speed at and before the accident was not persuasive to the extent that it differed from Mr. Peck's opinions.

58. The testimony and reports of the United States' orthopedic and neurology experts, Dr. Geoffrey Miller and Dr. Michael Gold, especially as to plaintiff's injuries, recovery, and necessary medical care, were credible and convincing. The testimony of plaintiff's orthopedic and pain management experts, Dr. Ramin Rabbani and Dr. Ali Sabbaghi, as to plaintiff's injuries, recovery, and necessary medical care were less persuasive with regard to the effect of the January accident had on plaintiff's medical condition.

59. The testimony and report of the United States' medical billing expert, Agnes Grogan, R.N., especially as to the reasonable value of plaintiff's past medical care, were credible and convincing. Dr. Rabbani's testimony about the reasonable value of plaintiff's past medical care was not persuasive to the extent that it differed from Ms. Grogan's opinions.

60. The testimony and report of the United States' life care planning expert, Linda Olzack, R.N., especially as to the cost of the future medical care that Dr. Rabbani claims plaintiff needs, was credible and convincing. However, in light of the possible repeal of, or changes to, the Affordable Care Act it is not clear that her testimony is based on a viable premise.

61. Any finding of fact that may be deemed to be a conclusion of law is hereby adopted as a conclusion of law.

## II. CONCLUSIONS OF LAW

### A. Governing law under the Federal Tort Claims Act

1. Under the Federal Tort Claims Act 28 U.S.C. §§ 2671 et seq. ("FTCA"), the substantive law of the state where the allegedly negligent act occurred applies. 28 U.S.C. § 1346(b)(1). To be cognizable, the claim must arise from the negligent or tortious act of a government employee acting with the scope of his or her employment

8

under circumstances where the United States, if it were a private individual, would be liable under the law of the state where the claim arose. 28 U.S.C. § 2674.

2.     California law governs plaintiff's negligence claim with regard to the January accident.

**B.     Elements of plaintiff's negligence claim**

3.     To prevail on his negligence claim, plaintiff has the burden of proving by a preponderance of the evidence:

- The United States was negligent;
- Plaintiff was harmed; and
- The United States' negligence was a substantial factor in causing plaintiff's harm.

CACI No. 400 (Dec. 2011).

**C.     Comparative fault**

4.     Under the doctrine of comparative fault, the original tortfeasor's liability is reduced if: (1) plaintiff or a nonparty was negligent, and (2) the negligence of plaintiff or the nonparty was a substantial factor in causing the plaintiff's harm.  See CACI Nos. 405 (Dec. 2009), 406 (June 2011).

5.     Accordingly, plaintiff's damages are reduced by the percentage of his responsibility if: (1) plaintiff was negligent; and (2) plaintiff's negligence was a substantial factor in causing his harm.  CACI No. 405.

6.     Plaintiff was negligent in driving in a manner that was not safe for the conditions when he was driving 53 mph in a 40-mph zone at the time the accident occurred.

7.     As set forth above, Ms. Silva was also negligent in making an unsafe lane change.  The Court finds that plaintiff and Ms. Silva were equally negligent and at fault in causing the January accident.

### D. Intervening cause

#### 1. Pre-existing conditions

8. A tortfeasor is not liable for a plaintiff's pre-existing conditions or the natural progression of those conditions. See, e.g., Whyatt v. Kukura, 157 Cal. App. 2d 803, 805 (Cal. Ct. App. 1958) (defendant not liable for plaintiff's "preexisting condition of osteoarthritis" of spinal bones, which was "not caused by the accident"); Carruthers v. Cunha, 133 Cal. App. 2d 91, 96 (Cal. Ct. App. 1955) (defendant not liable for spinal injuries "result[ing] from a degenerative type of arthritis long antedating the accident" where there was "no relation between [plaintiff's] condition and the accident").

9. Instead, the tortfeasor is liable for only those damages caused by the tort that are over and above the natural progression of the plaintiff's pre-existing conditions. See Renfroe v. United States, No. 04-cv-1955, 2005 WL 5887178, at *3 (C.D. Cal. July 6, 2005) (defendant not liable for plaintiff's low back pain where plaintiff had pre-existing degenerative spinal condition because plaintiff's expert "was unable to state with reasonable medical certainty whether [p]laintiff's current spinal pain stems from the degenerative process or from the [tort]"); Whyatt, 157 Cal. App. 2d at 805 (defendant not liable for most of plaintiff's claimed damages because "plaintiff's physical disabilities, as well as the various items of expense which made up her claim of … damages, were chargeable very largely to preexisting causes").

10. The burden is on the plaintiff to prove that his damages were caused by the tort and would not have occurred anyway because of his pre-existing conditions. See Renfroe, 2005 WL 5887178, at *3.

11. Consistent with these principles, if a plaintiff proves that his pre-existing conditions were (and were likely to have remained) asymptomatic but made him more susceptible to injuries — the "eggshell skull" rule — the tortfeasor must take the plaintiff as she finds him. See Hegyes v. Unjian Enters., Inc., 234 Cal. App. 3d 1103, 1144 n.4 (1991).

///

10

### 2. *Subsequent accidents*

12.     Subsequent accidents implicate two distinct legal principles: intervening cause and superseding cause.

13.     An intervening cause or force operates in producing harm to another after the actor's negligent act or omission has been committed.  Restatement (Second) of Torts § 441 (1965).

14.     A superseding cause is a *type* of intervening force.  "[F]or an intervening act properly to be considered a superseding cause, the act must have produced harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible."  Lugtu v. California Highway Patrol, 725, 28 P.3d 249, 263 (Cal. 2001) (quotation marks omitted).

15.     California law has no bright-line rule for determining when a subsequent accident constitutes a superseding cause.  Instead, the state has adopted the general superseding cause principles from the Restatement of Torts.  See Stewart v. Cox, 55 Cal. 2d 857, 864 (1961).  Under those principles, whether an intervening force constitutes a superseding cause depends on:

(a) whether the intervening force brings about harm different in kind from what would otherwise have resulted from the original accident;

(b) whether the intervening force was unusual or extraordinary;

(c) whether the intervening force operated independently of any situation resulting from the original accident;

(d) whether the intervening force was due to another party's act or failure to act;

(e) whether the party responsible for the intervening force is liable to plaintiff; and

(f) the degree of culpability of the party responsible for the intervening force. Restatement (Second) of Torts § 442; see also Stewart, 55 Cal. 2d at 864 ("The rules set forth in sections 442–453 of the Restatement of Torts for determining whether an intervening act of a third person constitutes a superseding cause . . . have been accepted in California.").

16. These two legal principles have different implications for the original tortfeasor's liability. If a subsequent accident rises to the level of a superseding cause, it entirely cuts off the original tortfeasor's liability for all harm after the subsequent accident. <u>See</u> Restatement (Second) of Torts § 440 cmt. b ("A superseding cause relieves the actor from liability, irrespective of whether his antecedent negligence was or was not a substantial factor in bringing about the harm."). A superseding cause thus "absolves a tortfeasor, even though his conduct was a substantial contributing factor, when an independent event intervenes in the chain of causation[.]" <u>Soule v. Gen. Motors Corp.</u>, 882 P.2d 298, 312 n.9 (Cal. 1994).

17. By contrast, if the subsequent accident was not a superseding cause, and instead was merely an intervening cause of the plaintiff's harm after the subsequent accident, then liability for the post-second-accident harm is apportioned between the original tortfeasor and the party responsible for the subsequent accident based on each's percentage of responsibility for that harm. <u>See</u> Restatement (Second) of Torts § 441 cmt. d. (where an intervening force arises because of conduct by the original tortfeasor *and* a third party, the original tortfeasor and the third party are concurrently liable, even though the original tortfeasor's conduct has ceased to operate actively); CACI No. 406.

18. Importantly, neither of these doctrines turns on the distinction between a new injury and an exacerbation of a prior injury. <u>See</u> Restatement (Second) of Torts § 442; CACI No. 406. A subsequent accident that causes new injuries can constitute either a superseding cause or an intervening cause, depending on the factors above. The same is true of a subsequent accident that exacerbates prior injuries.

### E. Application to This Case

#### 1. *Plaintiff's pre-existing degenerative disc bulges*

19. The evidence at trial established that plaintiff's disc bulges were degenerative and pre-existed the January accident. The radiologist's report of plaintiff's March 2015 lumbar spine MRI noted "[m]ultilevel degenerative changes of the lower lumbar spine." Exhibit No. 512-0004. Consistent with that report, the United States'

orthopedic expert, Dr. Geoffrey Miller, testified that the small disc bulges at multiple vertebral levels shown on the March 2015 MRI were "the result of a long-term degenerative process instead of an acute traumatic event."

### F. Effect of the July 2015 work accident

20. The evidence showed that plaintiff was tilting a water cart at work on July 11, 2015, when he felt a sharp pain in his lower back. Exhibit No. 523-0190; Lewis Trial Decl. ¶ 10, ECF No. 43. This July 2015 work accident was an intervening cause of plaintiff's later back problems. See Restatement (Second) of Torts § 441.

21. The July 2015 work accident brought about harm different in kind from the harm resulting from the January accident. See Restatement (Second) of Torts § 442(a). Before the July 2015 work accident, there was no medical evidence of nerve impingement (as opposed to stenosis, or narrowing), as both Dr. Miller and Dr. Gold testified. Miller Trial Decl. ¶¶ 36–38; Gold Trial Decl. ¶¶ 35–36. But after the July 2015 work accident, plaintiff exhibited impingement (albeit mild) of the L5 nerve root, as shown on the EMG from July 30, 2015. Exhibit No. 519-0004–0007. Dr. Gold testified on redirect that those EMG findings were consistent with a nerve injury sustained in the July 11, 2015 work accident. This medical evidence is also supported by plaintiff's work history. In the six weeks after the January accident, plaintiff missed less than eight hours of work in his job as a machine operator (including paid sick time and absences). Exhibit No. 523-0117. His regular job functions before the January accident involved lifting 100 pounds. Lewis Trial Decl. ¶ 11, ECF No. 43. And although there was conflicting evidence about whether he temporarily stopped lifting 100 pounds at work after the January 2015 accident,[1] by June 2015 Dr. Rabbani had cleared him to perform all of his job functions. Exhibit No. 523-0144. By contrast, immediately after

---

[1] Plaintiff testified that he went on "light duty" after the January accident. Lewis Trial Decl. ¶ 11. However, his employment records show no work restrictions during that time, see generally Exhibit 523, and Dr. Rabbani admitted that he did not impose any work restrictions at that time.

the July 2015 work accident, plaintiff was unable to work at all.  Dr. Rabbani determined that he was totally disabled.  Exhibit 523-0173.  Plaintiff admitted on cross-examination that he went on disability leave and missed the next six months of work.

22.    However, the July 2015 work accident arose because plaintiff lifted an object that was not out of the ordinary.  <u>See</u> Restatement (Second) of Torts § 442(b).

23.    In addition, the July 2015 work accident did not operate entirely independently of any situation resulting from the January accident.  <u>See</u> Restatement (Second) of Torts § 442(c).  Dr. Miller testified on redirect that the January accident did not make plaintiff vulnerable to injury from future accidents.  However, as indicated above, Dr. Rabbani disagreed, opining that the January accident had caused damage to plaintiff's lumbar spine that was made worse by the July 2015 work accident.

24.    Because the evidence supports the conclusion that plaintiff's injury from the January accident exacerbated the harm that plaintiff subsequently suffered from the July 2015 work accident, the July accident was an intervening, but not a superseding, cause of plaintiff's back problems after July 2015.  <u>See</u> Restatement (Second) of Torts §§ 441–42.

25.    Apportioning liability for plaintiff's damages after July 2015 requires determining what additional medical care plaintiff needed and what additional pain he experienced from the July 2015 work accident *because of* the January accident.  The United States would be liable for that additional medical care and pain (assuming that the United States were 100% at fault for the January accident).  <u>See</u> CACI No. 406.

26.    Here, the evidence showed that plaintiff's prognosis from the January accident alone was positive.  Dr. Miller testified on redirect that if plaintiff had been in the January accident only, he would have gotten better and would not have needed any more medical care.  There was no medical evidence of nerve impingement or any other injury that would be expected to cause ongoing pain.  Consistent with that medical evidence, the January accident did not cause plaintiff to miss any work.  Exhibit No. 523-0117.  Finally, plaintiff's physical therapy records show that his lower back pain was steadily declining from January through June 2015, according to his own reports.

Exhibit No. 515-0028–0035.  On a scale of 1–10, his pain levels went from 7–8 in January, February, and March, down to 3–4 in April, May, and June.  As such, it appears that, at most, only twenty-five percent of plaintiff's injury resulting from the July 2015 work accident can be attributed to the January accident.

### G.    Effect of the December accident

#### 1.    *The December crash was an intervening cause*

27.    Plaintiff was stopped at a red light in December 2015 when he was rear-ended by another car.  Lewis Trial Decl. ¶ 9.  The crash was so severe that it caused his car to hit the car in front of him.  The emergency room classified the crash as "major."  Exhibit No. 518-0024.  Like the July 2015 work accident, the December accident was an intervening cause of plaintiff's later back problems.

28.    As explained above, plaintiff's prognosis from the January accident alone was generally positive.  However, after the December accident, plaintiff began experiencing right-sided symptoms for the first time.  Exhibit No. 535-0070.  He also exhibited left leg weakness, which he had not had since his back surgery in October 2015.  Compare Exhibit No. 535-0056–0065 (motor strength in legs was 5/5), with 535-0066 (motor strength in lower left leg was 4/5).  Finally, his lower back pain — which he had reported to Dr. Rabbani as fluctuating between 5 and 8 in the two months before the December 2015 accident — went up to 10/10 after the accident.  Compare Exhibit No. 535-0058 (5/10), 535-0060 (8/10), and 535-0063 (5/10) with 535-0066 (10/10).  Dr. Rabbani found that December 2015 accident resulted in an acute aggravation—lasting only several weeks—of plaintiff's underlying condition, which was caused by the January 2015 accident.  Rabbani Trial Decl. ¶ 18.

29.    Because the evidence supports the conclusion that plaintiff's injury from the January accident exacerbated the harm that plaintiff subsequently suffered from the December accident, the December accident was an intervening, but not a superseding, cause of plaintiff's back problems after July 2015.  See Restatement (Second) of Torts §§ 441–42.

15

30.     Apportioning liability for plaintiff's damages after December 2015 requires determining what additional medical care plaintiff needed and what additional pain he experienced from the December 2015 work accident *because of* the January accident. The United States would be liable for that additional medical care and pain (again assuming that the United States were 100% at fault for the January accident). However, the United States is not liable for any medical care or pain over and above what would have been expected from the December accident had the January accident never occurred.

31.     In addition, the United States is not liable for plaintiff's damages caused by the other driver in plaintiff's December car accident 2015 if: (1) the other driver in the December 2015 accident was negligent; and (2) the negligence of the other driver in the December 2015 accident was a substantial factor in causing plaintiff's harm. CACI No. 406.

32.     The other driver in plaintiff's December accident was negligent, having rear-ended plaintiff while he was stopped at a red light.

33.     This negligence of the other driver in the December accident was a substantial factor in causing plaintiff's harm which, which caused a recurrence of some of plaintiff's earlier back pain and new injuries that were not the result of the January accident.

34.     Given these facts, the United States' liability for plaintiff's post-December 2015 damages must be reduced accordingly. In this regard, it appears that to the extent the United States can be held accountable for plaintiff's injuries post December 2015, not more than ten percent of plaintiff's damages can be said to be the result of the January accident.

## H.     Past medical expenses

35.     In total, Mr. Lewis's medical providers have billed $205,283.91 for all of his medical care since the January accident giving rise to this case (i.e., care both

/ / /

attributable and not attributable to the accident).  The reasonable value of that care is $91,291.28.

36.    The following chart shows the billed amounts and the values for Mr. Lewis's care attributable to the January accident:

|  | Billed amount | Value attributable to the January accident |
| --- | --- | --- |
| Care attributable to January accident according to Dr. Miller & Dr. Gold | $16,211.50 | $11,786.90 |
| Rest of care between January accident and July 2015 work accident | $41,955.00 | $19,207.06 |
| Care between July 2015 work accident and December accident | $110,881.41 | $50,326.62 |
| Care since December accident | $30,811.00 | $9,970.00 |
| Total | $205,283.91 | $91,291.28 |

37.    To recover damages for past medical expenses, plaintiff has the burden of proving by a preponderance of the evidence the reasonable value of past medical care he received that was reasonably required and attributable to the tort.  CACI No. 3903A (Sept. 2003).  The amount recoverable is limited to "the lesser of (1) the amount paid or incurred for past medical expenses and (2) the reasonable value of the services." Corenbaum v. Lampkin, 215 Cal. App. 4th 1308, 1325–26 (Cal. Ct. App. 2013).

38.    Plaintiff has not met his burden of proof in establishing that all of his past medical care was reasonably required and attributable to the January accident.  Much of that care, including the physical therapy beyond the first 20–24 sessions, the epidural injections, and the back surgery, was not reasonably required for the moderate back and neck strain that plaintiff sustained in the January accident.

39.    The testimony as to the reasonableness of the rates charged is disputed.  The government argues that several of plaintiff's medical providers bundled their charges for treatment, which constitutes double billing.  For example, when plaintiff had back surgery, the surgery center charged separately for the back surgery and for the operating and recovery rooms, even though the usual, customary, and reasonable rates for back

surgery already include the operating room and recovery room.  Plaintiff's experts disagree.

40.     The Court finds it appropriate to compute plaintiff's damages from past care based on the amounts actually billed to him because the government's evidence as to customary billing practices is not persuasive.  Based on the foregoing the Court awards plaintiff the following compensatory damages:

| | |
|---|---:|
| Care from the date of the January accident up to the date of the July work accident (1/2 of the total amount billed) | $29,083 |
| Care for time beginning with the July work accident through the date of the December accident (1/2 of 25% of the total amount billed | $13,860 |
| Care since the December accident (1/2 of 10% of the total amount billed) | $1,540 |
| Total | $44,483 |

## I.     Future medical expenses

41.     To recover damages for future medical expenses, plaintiff has the burden of proving by a preponderance of the evidence the reasonable value of each of the expected future medical expenses reasonably certain to be needed in the future and attributable to the tort. CACI No. 3903A (Sept. 2003).

42.     Although plaintiff adduced testimony from Dr. Sabbaghi that a nerve stimulator would be necessary to alleviate further pain, the preponderance of the evidence suggests that such a procedure is likely to reduce plaintiff's pain both because of plaintiff's possible lack of suitability for such treatment and the nature of the procedure which involves the implanting of a nerve stimulator in the spine.  Plaintiff has not met his burden of proof in establishing that any future medical expenses are reasonably certain to be needed in the future as a result of the January accident.

## J.     Non-economic damages

43.     Although there is no fixed standard to calculate the amount a plaintiff is entitled to recover for pain and suffering, any damages award for pain and suffering must be reasonable, based on the evidence and factfinder's common sense, and caused by the tort.  CACI No. 3905A (Dec. 2011); Duarte v. Zachariah, 22 Cal. App. 4th 1652, 1665

(1994) ("'There is no direct correspondence between money and harm to the body, feelings or reputation. . . . The discretion of the judge or jury determines the amount of recovery, the only standard being such an amount as a reasonable person would estimate as fair compensation.'") (citation omitted); <u>Miller v. San Diego Gas & Elec. Co.</u>, 212 Cal. App. 2d 555, 558 (1963) (to be recoverable, damages must be caused by tort).

44.     Here, plaintiff has testified to pain and suffering and all experts agreed that plaintiff's pain was genuine and significant.  In addition, plaintiff testified at a May 2, 2017 evidentiary hearing that he continues to have pain when engaging in activity and is required to take significant pain medication up to four times per week.

45.     The Court recognizes, however, that it must apply comparative fault principles and apportion fault for plaintiff's subsequent accidents, thus reducing plaintiff's award for economic and non-economic damages, including pain and suffering.  <u>See</u> CACI Nos. 406, 3960; Cal. Civ. Code §§ 1431.2(a)–(b).

46.     Accordingly, plaintiff is entitled to recover (i) fifty percent of his pain and suffering arising from the January accident, (ii) 12.5 percent (half of twenty-five percent) of his pain and suffering arising from the July accident, and (iii) five percent (half of ten percent) of his pain and suffering arising the December accident.

47.     Based on the record, it is impossible to disaggregate precisely plaintiff's pain and suffering arising from the January, July, and December accidents.  However, "[n]o definite standard or formula is prescribed by law to fix reasonable pain and suffering compensation."  Justice Zerne P. Haning et al., California Practice Guide: Personal Injury § 3:179 (The Rutter Group 2016).  "[D]amages for the intangible, noneconomic aspects of mental and emotional injury are . . . not readily subject to precise calculation.  The amount of such damages is necessarily left to the subjective discretion of the trier of fact."  <u>Greater Westchester Homeowners Assn. v. City of Los Angeles</u>, 603 P.2d 1329, 1338 (Cal. 1979).

48.     While plaintiff did not miss any work after between the January and July accidents, plaintiff underwent a variety of procedures and reported that he experienced

significant pain during that period. By contrast, the July accident resulted in plaintiff taking a leave from work, during which he received frequent physical therapy and medical care. According to Dr. Rabbani, the December accident resulted in an increase in acute pain lasting several weeks. Plaintiff testified at the May 2, 2017 evidentiary hearing that he continues to experience pain after engaging in certain activities and that he takes significant pain medication three to four days per week.

49. Accounting for the government's percentage of fault as described above and having heard plaintiff's additional testimony at the May 2, 2017 evidentiary hearing, the Court concludes that the government is liable in the amount of $100,000 for plaintiff's pain and suffering.

50. As such, the Court awards plaintiff $144,483 in total damages.

51. Any conclusion of law that is deemed to be a finding of fact is hereby adopted as a finding of fact.

Dated: May 24, 2017

_Christina A. Snyder_

Christina A. Snyder
UNITED STATES DISTRICT JUDGE